## TUSCUMBIA, COURTLAND AND DECATUR RAIL ROAD COMPANY, ET AL. v. RHODES.

1. R. being indebted, by an open account, to an incorporated Rail Road Company, the latter assigned the debt to one S., to whom the Company was largely indebted, and by whom suit was brought against R., in the name of the Company, and a judgment obtained thereon. Pending the suit against him, R. paid for the Company a large debt, as its surety, which debt existed previous to the assignment, by the Company, to S. Held—that as the Company was insolvent, at the time of the assignment to S., of the debt of R., the latter could set off in equity, the money he had paid for the Company, against the judgment obtained by S. ·

Error to the Chancery Court at Tuscaloosa.

THE bill was filed by the defendant in error. The material allegations, are, that the Rail Road Company was incorporated by an act of the Legislature, in 1832, and subsequently amended. That in the year 1836, the Board of Directors represented, that the Company could not sustain its credit, and meet its engagements from the proceeds of the subscriptions to the then capital stock, and that at an informal meeting of the Board, on the 27th June, 1836, the following preamble and resolutions were adopted:

" Whereas, it has been ascertained, from the report of the treasurer of this Company, that the amount of stock heretofore subscribed, and which has been paid by the subscribers, is insufficient for the purpose of paying for the cost of the road, and other improvements appertaining thereto. Be it therefore resolved, that the books of the Company be opened, for the purpose of disposing of stock, to the amount of one hundred and fifty thousand dollars, including the stock heretofore forfeited to the Company, and that subscribers for such stock be required to pay the same in three equal instalments, by giving accepted bills of exchange, with at least one good indorser; said bills to include interest, at the rate of six per cent., to be drawn payable at five, eleven, and seventeen months after the first day of August next, and that upon the delivery of said bills, to the treasurer of the said Company, certificates of stock, as for full payment, shall be issued in favor of said subscribers; and further, that the subscribers, or holders of said stock, shall be entitled to draw dividends on the same, for the year commencing on the first day of August next.

" Be it further Resolved, That the books shall be opened, under the direction and superintendance of the treasurer, and secretary of the Company, who shall attest the said subscription."

At the time this resolution was adopted, complainant was absent from the State, and that his name was subscribed without his authority, for seventy-five shares, and upon his return, and after the books were closed, he signed his name to the list of subscribers for seventy-five shares. But complainant charges, that the resolutions, and subscriptions, under them, were in contravention of the charter.

That Benjamin Sherrod was the President, and one David Deshler the treasurer; that they possessed the confidence of the stockholders, and managed the affairs of the Company. That in the year 1836, the treasurer of the Company represented to the Directors, and some of the stockholders, that the Company required the sum of fifty thousand dollars, to relieve it from debt, and that if that sum could be procured, the Company could continue its operations with advantage, and that the said Benjamin Sherrod had offered to lend that sum, upon bond, executed by respectable persons, and urged complainant to become one of the obligors in such bond, and make in this way the loan aforesaid. That complainant consented thereto, and together with eleven others,

executed a joint and several bond, in the sum of fifty thousand dollars to the said Sherrod; he having advanced to the Company that sum of money.

At the time of the execution of the bond, to show for whose use and benefit it was made, and for the purpose of guaranteeing the payment of the bond, and indemnifying the makers thereof, the Company passed the following resolution:

"At a meeting of the Board of Directors of the Tuscumbia, Courtland and Decatur Rail Road Co., on the 27th June, 1836, the following preamble and resolutions were adopted:

"Whereas, Benjamin Sherrod, has this day proposed a loan of fifty thousand dollars to this Company, for the term of five years, from the first day of January next, at eight per cent. per annum, interest to be paid annually; and whereas, the Directory have accepted the proposition, and have this day executed their joint and several bond, to the said Benjamin Sherrod, to secure the payment of said loan: now it is hereby declared, that said bond, though executed by the following persons in their individual capacity, yet the money borrowed, is for the benefit of said Company, and that said Company in its corporate capacity, is hereby made liable for the same, and a pledge is hereby given by the Company, that it will protect the individual makers of said bond, against the payment of the same." The bond is signed by twelve persons, including the complainant.

That in the early part of the year 1838, the Company became insolvent, and so continue to this time. That after the insolvency of the said Company, it transferred to Benjamin Sherrod, to indemnify him for certain claims, which he pretends to have against the Company, all the property, choses in action, and assets of the Company, and among other things, the said subscription list for additional stock, subscribed by complainant, and also other claims against him, amounting to $14,918 29.

That on the 4th September, 1840, the said Sherrod, in the name of the Company, brought suit against complainant, to recover said amount. That on the trial of the cause, complainant proved that all the obligors to the bond for $50,000, except three, had become insolvent, and that about the 1st January, 1841, complainant had been compelled to pay the said Sherrod, as his proportionable share, the sum of twenty-six thousand dollars, and upwards. But the Court held, that it was no defence to that ac-

Tuscumbia, Courtland and Decatur Rail Road Co. et al. v. Rhodes.

tion, and that the complainant could only have relief in equity, and a verdict was found, and judgment rendered against him, for $14,918 29. And in addition to the sum he has paid on the bond for the Company to Sherrod, he charges that the Company are largely indebted to him, and is wholly insolvent, and prays that the money paid by him for the Company, be set off against the judgment obtained for the use of Sherrod.

Sherrod, in his answer, admits the assignment to him by the Company of claims due it, amounting in the whole to $29,118 29, including the claim against complainant, which was done to indemnify him in part, for the sum of $196,196 14 paid by him, for the Company, to the Decatur Bank, besides the sum of $33,714 90, also paid by him for the Company, and is liable besides, for other large amounts. He insists, that he did not look to the Company for the loan of $50,000, but lent it on the faith of the parties to the bond, and that the entry on the minutes of the board, was an attempt on their part, to indemnify themselves. He admits the insolvency of the Company, and denies all fraud.

The corporation also answered the bill, setting forth the assignment to Sherrod, made by order of the Board of Directors, and together with the answer of Sherrod, containing many statements, admissions, and allegations not necessary to be stated.

Much testimony was taken, but as no material fact stated in the bill is now controverted, it is not necessary to state it.

The Chancellor, at the hearing, considering that there was a mutual credit, between the corporation and the complainant, as well as upon the grounds of the insolvency of the corporation, decreed that the money paid by him, to Sherrod, on the bond, as the surety of the corporation, should be *set off* in equity, against the judgment obtained by it at law, for the use of Sherrod.

From this decree, a writ of error is prosecuted by the defendants, and assign for error the decree made by the Chancellor.

PECK & CLARK, for plaintiff in error. The principles upon which Courts of Equity proceed, in cases like the present, may be thus stated: 1. Before the statute of set off at law, and that of mutual debts and credits in bankruptcy, Courts of Equity were in possession of the doctrine of set off, upon principles of natural

27

equity. [2 Story's Com. 656, § 1432 ; 4 Burr. 2220 ; 2 Paige, 581.]

2. When debts are mutual, though independent, yet, if there be a mutual credit between the parties, *founded at the time* upon the existence of some debt, due by the crediting party, equity will grant relief. By mutual credit, we are to understand a knowledge on both sides, of an existing debt, due to one party, and a credit given by the other, founded on, and trusting to such debt, as a means of payment. [Story's Com. § 1435; 7 Porter, 554.]

3. Courts of Equity follow the same general rules, as Courts of law, as to sets off. [3 Johnson Chan. 359.] Courts of Equity will set off distinct debts, where there has been a mutual credit, to avoid circuity of suits. [5 Mason, 212 ; 1 Edwards, 404.] So also where there has been an express, or implied agreement of stoppage. [2 Edwards, 76.]

To apply these principles ; The debt transferred by the corporation to Sherrod, was one which from its very nature, and the object of its creation precluded the idea of a mutual credit, between the corporation and Rhodes. Nor did the corporation owe him any thing, when the debt was created. Nor was the corporation indebted to him, when the ·assignment was made ; the transfer therefore to Sherrod, was not clogged by any existing equity.

HUNTINGTON, COCHRAN and HOPKINS, contra, contended, that the contract upon which the suit at law was brought, was void, because not authorized by the charter, and also because it was the exercise of banking powers. [Angel & Ames on Cor. 66 ; 2 Cowen, 664 ; ib. 678 ; 3 B. & A. 1 ; 5 Taunton, 792 ; 4 Ala. Rep. 558.]

That as the right of the complainant to the off set, did not arise until after the suit brought against him, it was not a good set off at law, and it was therefore necessary to resort to Chancery. [3 Ala. Rep. 256.]

They also maintained, that to constitute a mutual credit, it was not necessary that one should be a consequence of the other, or that the credit should be given at the same time; like mutual debts, they might arise at different times. [1 P. Wms. 326 ; 1 Atk. 228 ; Hop. 583 ; 2 Paige, 581; 5 Vesey, 108 ; 3 ib. 248 ; Bab. on Set Off, 57, 72 ; 5 Paige, 592 ; 4 Term. 123.]

Tuscumbia, Courtland and Decatur Rail Road Co. et al. v. Rhodes.

The pledge of the assetts of the Company, made it one of mutual credit.

The insolvency of one of the parties is a well established ground of equitable jurisdiction, to allow a set off. [6 Dana, 38, 305; 4 Bibb, 356; 1 Monroe, 194; 4 Conn. 302; 2 Hammond Ohio, 432.]

That the assignment being, of an open account, was a mere revocable power to collect the debts, or, in other words, a mere equitable right to the debts, which is countervailed by the opposing equity of Rhodes. [1 Brock. 456; 1 W. C. C. R. 178; 7 Johns. 377; 10 Wend. 85.]

They also cited, 2 Eq. C. Ab. 10; 2 Vernon, 117; 1 Litt. 153; Litt. S. C. 325; Poth. on Ob. 590; 10 I. B. Moore, 198; 3 Vesey, 248; 4 Term, 123, 212; 2 Murphy, 30.

ORMOND, J.—The Tuscumbia, Courtland and Decatur Rail Road Company, having brought a suit at law for the use of Benjamin Sherrod, against H. W. Rhodes, the defendant in error, and recovered a judgment against him, he has filed this bill to obtain the benefit of a set off, for money paid for the Company, after the suit was commenced.

Whatever may be the merits of the demand here attempted to be set off, it is very clear it cannot be set off at law, as it was not a subsisting demand when the action was brought, [Cox v. Cooper, 3 Ala. Rep. 256;] the question therefore is, whether this is a good set off in equity.

The true nature and extent of the doctrine of set off, in a Court of Equity, is one of some difficulty, complicated as it is, in the decisions made upon the subject, with the statutes of set off at law, where there are mutual debts, and of the statutes of bankruptcy, authorizing a set off where there are *mutual credits*. Mr. Justice Story has discussed this question in his Commentaries on Equity, 2d vol. 656, and more at large in the cases of Greene v. Darling, 5 Mason, 201, and How v. Shephard, 2 Sumner, 409. According to his opinion, equity follows the law in regard to set off, unless there is some intervening natural equity, going beyond the statutes of set off. That such a natural equity arises, where there are mutual credits between the parties, or where there is an existing debt, on one side, which constitutes the ground of a credit on the other, or, where there is an express or implied agrement,

that the mutual debts shall be a satisfaction *pro tanto* between the parties.

To the same effect, is the opinion of Chancellor Kent, in Duncan v. Lyon, 3 Johns. C. 358, and of this Court in French v. Garner, 7 Porter, 549. In *ex parte* Stephens, 11 Vesey, 27, Lord Eldon says, Courts of Equity were in possession of the doctrine of *set off*, long before the law interfered ; though where the Court does not find a natural equity, going beyond the statute, the rule is the same in equity as at law. See also, Mead v. Merritt, 2 Paige, 402 ; Burkley v. Munday, 5 Madd. R. 297 ; Robbins v. Holly, 1 Munroe, 194 ; Green v. Farmer, 2 Burr. 1214, and *Ex parte* Harrison, 12 Vesey, 346, and to these might be added a multitude of authorities, English and American, establishing the same general principle.

What then is the *natural equity*, or to speak with more precision, what are the peculiar circumstances, attending this case, which would authorize this Court, to set off the one demand against the other.

The facts are, that Rhodes, the complainant, became a subscriber with others, to the Rail Road Company, for seventy-five shares of its stock, at one hundred dollars a share, which was to be paid for, in accepted and indorsed bills of exchange, payable in five, eleven, and seventeen months, interest included. The object of the subscription, was to enable the Company to raise funds for the payment of its debts. About the same time, Sherrod made a loan to the Company of fifty thousand dollars, for five years, to secure the payment of which, Rhodes, and eleven others, executed a bond to Sherrod for that amount, payable also in five years; the Company, by an order on its minutes, pledging itself in its corporate capacity, for the payment of the debt. Subsequently, the Company became insolvent, and being indebted to Sherrod, in the sum of nearly two hundred thousand dollars, money paid by him for it, assigned to him some of its effects, and among other claims, the one against Rhodes for his sub scription, which he had not complied with, by executing bills of exchange ; together with other claims against him. Upon this demand against Rhodes, Sherrod brought suit in the name of the Company, for his use, and subsequently Rhodes paid to Sherrod. upon the bond for fifty thousand dollars, twenty-six thousand dollars. A judgment was obtained by the Compa-

ny, for the use of Sherrod, against Rhodes, and he now seeks to set off in equity, the money thus paid against the judgment.

It is not pretended, that there was in this case any express agreement to set off, or extinguish the claim of the Company against Rhodes, for his subscription, by the obligation entered into by the latter, to guaranty to Sherrod, the payment of the loan of fifty thousand dollars. Nor is there the slightest foundation for supposing, that there was an implied agreement, having the same object in view. Before such an implication could be made, there must have been a debt due, or to fall due, which might be presumed to be looked to by the parties, as the fund out of which the debt attempted to be enforced, was intended to be satisfied. So far is that from being the case here, that the Company debt was not to fall due until several years after the bills would have been paid. Besides, such a supposition would have been destructive to the avowed object of the parties, which was to raise money for the pressing exigencies of the Company, whilst this theory of the intentions of the parties, supposes, that the bills were not to be drawn, until the fact was ascertained, whether Rhodes would become liable on his suretyship for the Company. As it is certain there was no express agreement to that effect, it is equally as clear that none can be implied from the circumstances.

It is however argued, that although these transactions are not strictly mutual debts, they are *mutual credits,* to create which, it is supposed, it is not necessary that the debts should fall due at the same time. Waiving for the present, the inquiry, whether there was any debt due from the Company to Rhodes, before the actual payment of the money by him, we proceed to inquire, whether the term *mutual credit* has this meaning.

The statute of 2d Geo. 2d, which first allowed sets off at law, as well as our statute on the same subject, only authorizes " mutual debts" to be set off against each other. The term *mutual credits,* was first introduced in the bankrupt laws of England, as authorizing a set off in bankruptcy, which, in the English books, is said to be a term of larger import than *mutual debts.* Thus in *Ex parte* Prescott, 1 Atk. 230, it was held that a debt due the bankrupt, payable at a future day, might be set off against a debt then due to him, from the bankrupt; his Lordship holding, that although not a mutual debt, it was a mutual credit, within the meaning of the bankrupt law. So where a bill of exchange, ac-

214 ALABAMA.

Tuscumbia, Courtland and Decatur Rail Road Co. et al. v. Rhodes.

cepted by A, got into the hands of B, it was held in accordance with the same principle, that there was a mutual credit between A and B, although the former did not know the bill was in the hands of the latter. [Hankey v. Smith, 3 Term, 507, in note.]

So also, an accommodation acceptor to a bill, which did not fall due until after the bankruptcy, and was then outstanding in the hands of third persons, and paid by him after the commission issued, was held entitled to a set off, under the words *mutual credit*. [Smith v. Hodson, 4 Term, 211.] To the same effect are *Ex parte* Wagstaff, 13 Ves. 65, and Arbouin v. Trottoire, 1 Holt N. P. C. 408.

Now, in all these cases, it is to be observed, there was a *debt* due before the bankruptcy, though not payable until afterwards, and the whole effect of the bankrupt law, in respect to the question we are now discussing, seems to be, to dispense with those circumstances, which would be necessary to give the Court of Chancery jurisdiction in other cases. It must, however, to be the subject of a set off, be a *debt* actually, and unconditionally due, although it be not payable, until after the debt is due, against which it is proposed to set it off. In *Ex parte* Hale, 3 Vesey, 304, the acceptor of a bill exchange, having become a bankrupt, the indorser was compelled to take it up, and being indebted to the bankrupt ninety pounds, prayed that he might be at liberty to set off that sum, against the amount of the bill which he had been compelled to pay. The Lord Chancellor said, "There was no *mutual credit*. There was a debt created upon the estate, and due at the time of the bankruptcy, but that debt was not due to you, therefore in that respect the set off fails." To the same effect are Chance v. Isaacs and Smith, 5 Paige, 592.

According then, to this extended meaning of the term *mutual credit*, under the bankrupt law, the set off cannot be made in this case, as with no propriety can it be said, that there was any debt due from the Company to Rhodes, at the time this assignment was made to Sherrod. It was at most a contingent liability, to pay a debt for the Company, which might never be enforced against him, and certainly not stronger, than that of the case of the indorser of a bill in the cases cited from 3 Vesey, 304, and 5 Paige, 592. In the language of the Chancellor, in the latter case, at the time of the assignment, there were neither mutual debts,

nor mutual credits, which by the efflux of time, would necessarily ripen into mutual debts, between Rhodes and the Company.

It is however urged, that the insolvency of the Company, would give to Rhodes the right to set off in Chancery, the debt due from the Company to him, and that Sherrod can be in no better condition. Conceding, as such appears to be the weight of authority, that he would have this right against the Company, has he the same right against the assignee of the Company?

By the assignment of the Company for a valuable and full consideration, Sherrod became invested with all the rights the Company then had in the thing transferred, and the judgment has ascertained, that this was a just claim, at that time, to recover the debt. Can this claim be divested, by any subsequent equity, arising between the assignor and the debtor, not coneected with the debt so assigned? In our opinion it cannot.

In Smith v. Pettus, 1 S. & P. 107, the Court declared that an equity inherent in the contract, travelled with the debt, into the hands of the assignee, and would be enforced against him. In Green v. Darling, 5 Mason, 214, this precise point arose, and the Court say, " Where a *chose in action* is assigned, it may be admitted, that the assignee take it subject to all the equities existing between the original parties, as to that very *chose in action,* so assigned. But that is very different, from admitting that he takes subject to to all equities subsisting between the parties, as to other debts, or transactions. There is a wide distinction between the cases. An assignment of a chose in action, conveys merely the rights which the assignor then possesses to that thing. But such an assignment, does not necessarily draw after it all other equities of an independent nature."

The equity in this case, between Rhodes and the Rail Road Company, has no connection whatever, with the debt transferred by the latter to Sherrod. They are totally distinct and unconnected. By the payment of the surety debt, Rhodes merely became the creditor of the Company in general, and although, in equity, the Company, being insolvent, would not have been permitted to enforce their claim against him, Sherrod is not affected by it, because his rights are to be admeasured, by the condition of the debt at the time of the transfer. If Rhodes could not have defended himself against the payment of it then, he cannot now, unless he could show an equity inherent in the thing assigned, in

which event he might enforce it against the assignee, although it arose subsequent to the transfer.

The objection that the subscription for the stock was void, because contrary to the charter, cannot be raised in this Court; all such inquiries are foreclosed by the judgment and release of errors at law.

It is further urged, that the debt so assigned by the Company, was pledged by the Company for the payment of the loan of fifty thousand dollars. It is as follows; " To secure the payment of said loan, it is hereby declared, that the said bond, though executed by the following persons in their individual capacity, yet the money is borrowed for the benefit of said Company, and that said Company in its corporate capacity, is hereby made liable for the same, and a pledge is hereby given by the Company, that it will protect the individual makers of said bond, against the payment of the same." If it were conceded, that this was a pledge of the assetts of the Company, and not a mere guaranty, it would avail nothing, as it is utterly inconceivable that the Company should pledge the bills of exchange, for the term of five years, when the whole design of the subscription, and the loan, was to raise money, to meet the demands, then pressing on the Company. It is true, the bills of exchange were never executed, but in ascertaining the meaning of this *pledge*, we must look to the state of things then existing, and it was certainly expected by the Company, that the bills of exchange would be executed by the first of August, ensuing the arrangement, otherwise the whole proceeding was solemn trifling. Whatever then be the meaning of this pledge, whether a mere guaranty, or a pledge of its existing and future resources, it could not have been the intention to pledge the bills of exchange, or if they were not executed, the amount of the subscription for the stock, as that would have defeated the very purpose of the arrangement. We cannot under these circumstances, infer such an intention from the employment of, to say the most of it, an ambiguous phrase.

It results from the conclusions here attained, that the Chancellor erred in his decree perpetuating the injunction to the judgment at law, and it is therefore reversed. And this Court, proceeding to render such a decree as the Chancellor should have rendered, hereby order, adjudge and decree, that the bill be dismissed, at the cost of the complainant.

ON the petition of the plaintiffs in error, the cause was re-argued by HOPKINS and HUNTINGTON, for the plaintiff in error.

PECK & CLARK, contra.

GOLDTHWAITE, J.—The matters of doubt in this cause, which principally induced us to allow a re-argument, are those which arise out of the insolvency of the Rail Road Company, when it made the assignment to Sherrod, of the debt due from Rhodes, and from the fact that the debt which he now seeks to stop, was not then due. To these we shall chiefly address our examination.

The doctrine of set off, or the compensation of one debt by another, seems to have been entirely unknown to the common law, unless the setting off judgments of the same Court, against each other, may be construed as asserting some original jurisdiction over this subject. Its defect in this particular, must have been perceived, when commercial transactions became in anywise general; especially when insolvency or intestacy happened and there were cross demands existing. We may therefore expect to find the development of the equitable doctrine, and its application, among the earliest reported Chancery cases. We find the English Chancery Judges frequently asserting the doctrine of stoppage, which was known to the Equity Courts, anterior to the statutes of set off and bankruptcy: but what this stoppage was, or what equitable set off now is, does not seem to be any where very clearly explained, and it will best appear by a collection of some of the cases.

The first is Peters v. Soame, 2 Vern. 428, decided in 1701. There the bill was by the assignees of a bond, against the obligor, and the assignees in bankruptcy of the assignor, to compel payment to the assignees. The *obligor* insisted, that the assignor of the bond owed him a sum of money, for goods sold, and claimed to retain it. The *assignees in bankruptcy,* that they, as representatives of creditors, had an equal equity with the assignees of the bond, (that having been assigned as an indemnity merely,) and having the legal title also, their claim was superior. It was held, that the assignees of the bond had the better equity, as. against the assignees in bankruptcy, but the stoppage under such circumstances, by the obligor, was considered a good equity.

28

Hawkins v. Freeman, 2 Eq. Ca. 10 c. 10, was decided some years afterwards; at least such is the inference, as later Judges say it was by Lord Macclesfield. There the complainant and the defendant's intestate, were both tradesmen, and mutually sold each other goods. The complainants were indebted £30, to the intestate, and he to them in £100, but dying intestate and insolvent, the defendants, as his principal creditors, took out administration, sued the complainants at law, and obtained a judgment. The bill was filed to have the debt of £30 set off, and it was so decreed, as well as that the defendants should pay the balance, in due course of administration.

It will be seen that the first of these two cases may have been decided on the broad ground, that when the complainant sought relief, upon an equitable title, it let in a cross debt as a defence. The second rests alone on the fact of insolvency, unless it is also to be considered as sustaining the jurisdiction, in any case of cross demands. Both were made previous to any statute of set off, and before the general statutes of bankruptcy, though the temporary bankrupt act of 4 Ann, c. 17, was then in force, and in neither is it pretended, that the ground of jurisdiction rested on any other principle than natural equity.

Dowman v. Matthews, Prec. in Chan. 580, was decided in 1721, the same year with the passage of the general bankrupt act of 7 Geo. 1; and its facts are very similar to those of Hawkins v. Freeman. Lord Macclesfield held the stoppage to be a good equity, though *generally*, he said, it was no payment, and there were cases in which it could not be done; as a man might not stop his rent for money due himself, nor that due upon a bond toward satisfaction of a simple contract debt. Insolvency was not spoken of in terms, but, he said, in cases of *this nature*, the Court would seize on the smallest circumstances to imply a mutual credit; as the carrying, or dealings for years, or if no interest had been paid. It was said at the bar, that before the passage of the then recent act 7 Geo. 1, the debtors of bankrupts were without remedy; but the Lord Chancellor observed, the statute was passed because it was reasonable to have been so before. The remark and the answer evidently referred to suits at law, for Peters v. Soame had, twenty years before, decided that an ordinary debtor could have stoppage in equity, and the same was held in 1716, by Lord Cowper, in Lanesborough v. Jones, 1 P. Wms. 325. In that

case, the assignees of the insolvent were seeking to foreclose a mortgage, and the mortgagor was allowed to stop a legal debt due from the insolvent. The assignees asserted, they took the entire estate, and that the debtor was compelled to prove his debt, under the commission, and take a *pro rata* dividend, but it was determined, on principles of natural equity, that the debtor was entitled to stop his debt against the bankrupt, and that his assignees only stand in his condition.

In Jeff. v. Wood, 2 P. Wms. 128, decided ten years after the first general bankrupt act, the Master of the Rolls said, "it may be a doubt, whether an insolvent person may recover against his debtor, to whom at the same time he owes a greater sum; though I own it is against conscience, A should be demanding a debt of B, to whom he is indebted a larger sum, and would avoid paying it." He then referred to the cases noticed by us as establishing that the least evidence of an agreement for stoppage, would let in the set off.

In Whitaker v. Rush, Amb. 407, the Master of the Rolls, for the first time, asserted, that the doctrine of set off, for a long period did not prevail in England, and was first introduced with the statute 5 Geo. 2, and Lord Hardwicke, in *Ex parte* Prescott, 1 Atk. 230, says, that before its passage, a debtor of the bankrupt being also a creditor, was obliged to prove his debt under the commission, and receive a dividend only, and that statute was passed to remedy this great inconvenience. These remarks must be referred to legal suits and proceedings, by the commissioners, for neither of these Judges could have been ignorant of the decisions made *on bills in equity*, by their predecessors, which certainly held a different language. It will be borne in mind, that the question before him arose on a petition in bankruptcy, and was, whether the debtor of a bankrupt also a creditor, could *retain* his debt, which was *not then due*. No cases being cited on either side, Lord Hardwick said, he must make a precedent, and held, the equity of the statute extended to that case, as it gave the creditor whose debt was not due, the right to prove it, and secure a dividend under the commission.

The equitable right of retaining was carried further, by the same Judge, for in *Ex parte* Deeze, 1 Atk. 228, held, that goods in the hands of a debtor of the bankrupt, could be retained until a general debt was paid, though if there had been *no bankruptcy*,

the debt could not have been set off against an action at law, for the goods, the holder having no lien on them, or having a lien on them for a portion only of his debt. At the time of these decisions, and for many years afterwards, it was the settled law, in the Courts of common law, that an *accommodation acceptor*, not having paid the bill when the bankruptcy occurred, though he afterwards did so, could not prove its amount under the commission. [Chilton v. Whiffer, 3 Wils. 13; Young v. Hackley, ib. 346.] Yet both the Courts of Law and Chancery, allowed him to retain the same liability, after its payment, against the claim of the assignees for a debt due to the bankrupt at the commission of the act of bankruptcy. [Smith v. Hodgson, 4 Term, 212; *Ex parte* Wagstaff, 13 Vesey, 65.] These decisions, so fully carrying out the equitable doctrine of stoppage, left no room to complain of hardships, and except the jurisdiction exercised by the Chancellors in bankrupt cases, there was little space for its exercise on the general principles. The English Chancellors then began to doubt as to the nature and origin of the doctrine, though in general they conceded that equity had jurisdiction to some extent. [James v. Kyneer, 5 Vesey 108; *Ex parte* Stephens, 11 ib. 24; Taylor v. Okey, 13 ib. 180; *Ex parte* Blagden, 19 ib. 465.]

In the comparatively recent case of Piggot v. Williams, 6 Wadd. 95, Sir John Leach refused, where a bill was filed by a solicitor to foreclose a security, by way of mortgage, to sustain a demurrer to a cross bill, insisting upon a breach of duty, whereby costs were occasioned, and said, the proper course would be to retain it, until an issue of *quantum damnificatus* was tried. And in Whyle v. O'Brien, 1 Sim. & Stu. 531, the jurisdiction to set off one legal demand against another, was expressly denied. In Rawson v. Samuel, 1 Craig. & Ph. 161, Lord Cottenham says, we speak familiarly of equitable set off, as distinguished from set off at law, but it will be found that this equitable set off exists in cases where the party seeking the benefit of it can show *some equitable ground for being protected* against his adversary's demand.

Perhaps it will hereafter be found, if it is necessary to deduce general principles from all the existing English cases,* upon the subject of set off, that they may be thus stated: 1. That although Courts of Equity at first assumed jurisdiction on the natural equi-

ty, that one demand should compensate another, and that it was iniquitous to attempt at law to enforce more than the balance, yet now they only exercise it when a legal demand is interposed to an equitable suit. 2. When an equitable demand cannot be enforced at law, and the other party is suing there. 3. Or where the demands are both purely legal, and the party seeking the benefit of the set off, can show some equitable ground for being protected.

We think it clearly deducible, from the general scope of these decisions, that insolvency was recognized as a distinct equitable ground, entitling the party to relief, even in cases where both demands were purely legal.

In the American Courts, the cases are more numerous, and quite as decisive to show, that the same principle obtains in them generally. In Sampson v. Hart, 14 John. 63, Judge Spencer asserts, that insolvency furnishes a strong and substantial ground of equity, as a meditated fraud. Other decisions rest the jurisdiction on the ground, that without its exercise, the party having a clear natural equity, would be without relief. [Lindsay v. Jackson, 2 Paige, 281 ; Pond v. Smith, 4 Conn. 302 ; Ford v. Thornton, 3 Leigh. 695 ; Feazle v. Dillard, 5 ib. 30 ; Collins v. Farquer, 1 Litt. 153 ; Payne v. Landon, 1 Bibb. 519 ; Robbins v. Holley, 1 Mon. 191; Rowzel v. Gray, Litt. S. C. 487 ; Dickinson v. Chinn, 4 Mon. 1; Dye v. Claunch, 5 J. J. M. 659 ; Chamberlain v. Stewart, 6 Dana, 32 ; Merrill v. Louther, ib. 305; Walker v. Chamberlain, 8 ib. 184 ; Sarchett v. Sarchett, 2 Ohio, 432 ; Cullum v. Branch Bank, 4 Ala. Rep. 21; Pharr v. Reynolds, 3 ib. 521 ; Abbey v. Van Camper, Freeman Chan. 273.]

The only case which seems to indicate a different conclusion, is Green v. Darling, 5 Mason, 201, but in that, there was no consideration of, or decision upon, this question, though it seems to have been in some degree involved by the facts stated. Judge Story also seems to infer, from Lord Hardwick's expression with reference to the time when the doctrine of set off was introduced, that insolvency alone will not give jurisdiction. [2 Story's Eq. § 1436, note 1.]

Notwithstanding the doubt of this eminent jurist, we think it may be considered as well settled, that insolvency furnishes a ground for the interposition of equity, in cases over which, otherwise, there would be no jurisdiction, as in the case of a debtor

who claims to set off a legal demand against his judgment credi-
tor, which he cannot enforce, or have an adequate remedy for at
law, by reason of the insolvency.

This conclusion, though it will aid us materially, does not dis-
pose of the case under consideration, as it yet remains to be con-
sidered, whether Rhodes' demand, arising from the fact, that he
was the obligor in the bond to Sherrod, for the accommodation
of the Company, is a debt which can be set off in equity. The
circumstances attending the case require, that this case shall be
considered in two aspects.  1. Whether this demand, at the time
of the assignment, was a debt, as distinguished from a contingent
liability.  2. Whether its not being due at that time, though af-
terwards paid by Rhodes, invests the assignee of the Rail Road
Company with the superior equity.

In the opinion formerly delievered, we considered Rhodes' en-
gagement as a contingent liability merely, and from that deduced
the conclusion, that he was invested with no rights or equities un-
til its payment.   We then deemed it similar to the engagement
of an indorser, which in *Ex parte* Hale, 3 Vesey, 304, and
Chance v. Isaacs, 5 Paige, 592, was considered as giving no
right to retain, against a debt assigned before the maturity of the
debt, and payment of it.   Our conclusion was based on these ad-
judications, and we are now satisfied, that the ground of our for-
mer decision is untenable.   If it was important to draw a distinc-
tion between an engagement to pay a sum of money absolutely,
for another, as by accepting his bill, or, as here, by giving a bond
for his debt, and the indorsement of his note, there can be no ques-
tion, that Rhodes' engagement is precisely the same as that of an
accommodation acceptor, and the cases before cited, of *Ex parte*
Wagstaff, 13 Vesey, 65, and Smith v. Hodson, 4 Term, 212,
show that such an acceptor, after paying his bill, may retain.
But the distinction supposed to be established by *Ex parte* Hale,
is not deemed to be a sound one in Collins v. Jones, 10 B. & C. 777,
and is at variance with that, as well as Ballard v. Nash, 8 B. & C.
105, where indorsers subsequently paying the bill, were permit-
ted to retain, even at law, against the assignees.   Independent of
these adjudications, it is very difficult to conceive what differ-
ence there is between the equities of an acceptor and indorser.
If there was, the strange anomaly would be seen, of allowing the
retainer, if the party holding the bill was unable to negotiate it,

in consequence of the doubtful credit of him who afterwards becomes bankrupt, and refusing the same right when the goodness of the paper has been avouched for by the indorsement. It is impossible that natural equity can be governed by distinctions so subtle. We are constrained therefore, to concede, that if the demand now asserted for Sherrod's benefit, was the property of the Rail Road Company, Rhodes' right to set off his demand, in equity, would be clear, by reason of the admitted insolvency of the Company.

And this brings us, lastly, to consider, whether the right which Rhodes, under such circumstances, would be entitled to, is overcome by any superior equity remaining in Sherrod, and arising from the fact, that the debt which Rhodes had bound himself to pay, was not due when his own liability was assigned by the Rail Road Company, though subsequently paid, upon the rendition of the judgment for Sherrod's use.

Many of the cases cited upon the first point examined by us, show very distinctly, that the assignee of a chose in action takes it subject to all the equities existing at the time of the assignment, and that the right to set off a debt is one of these equities. [Peters v. Soame, 2 Vern. 428; Feazle v. Dillard, 5 Leigh. 30; Chamberlain v. Stewart, 6 Dana, 32; Merrill v. Louther, ib. 305; Walker v. Chamberlain, 8 ib. 164.] Judge Story evidently doubted the existence of such a rule, when he decided Green v. Darling, for he there says, "it may be admitted that the assignee takes the chose in action, subject to all the equities existing between the original parties, as to that very chose in action; but that is very different from admitting that he takes it subject to all equities subsisting between the parties, as to other debts or transactions. The assignment of a chose in action conveys merely the rights which the assignor then possesses, to that thing, but it does not necessarily draw after it all other equities of an independent nature."

The rule recognized by the other cited cases, grows out of, and depends upon, the fact that set off is a natural equity, and being so, it at once attaches itself to all demands, the *legal title* to which is incapable of transfer. The observations made in Green v. Darling, apply with full force to that class of choses in action which are capable of being transferred, so as to invest the legal title in another. Such as notes and bills transferred by in-

dorsement, or other mode which passes the legal title, *after they are due.* As to these, there is no inherent equity to set off a cross demand, because the law itself permits the legal title to be transferred. The cases are numerous and consistent, that the party charged on such a bill, or note, can only examine the particular equities growing out of that transaction. [Burroughs v. Moss, 10 B. & C. 558 ; Breedlove v. Robinson, 7 Porter, 541, and cases there cited.]

Our statute, which makes bonds and notes assignable, extends the right of set off to all demands had before notice of the assignment ; but if the law is, as seems to be supposed in Green v. Darling, there would, in this State, be no equities which would warrant a set off against an open account, after its assignment, as it is with us prohibited by no statute, other than the general one, and if the assignee is not charged with the natural equity, he would recover in all cases. We apprehend, the legal rule is, that so long as a debt must be sued in the name of the original creditor, it is *prima facie* subject to be set off by the debtor, but that Courts of Law, at the present day, as well as Courts of Equity, now protect the interest of the equitable owner, so as not to affect him with any set off obtained, or payment made, after notice of the assignment.

The Kentucky decisions, before cited, seem to place the subject on its proper foundation, when they held, that to let in a set off on the mere ground of insolvency, it must be shown to have existed when the assignment of the demand was made. [Robbins v. Holley, 1 Monroe, 191 ; Walker v. Chamberlain, 8 Dana, 164.] The equitable rights growing out of the insolvency attach immediately, and as soon as it exists; whatever these may be, they can never be affected by a subsequent assignment, however meritorious the consideration, for the equity of the assignee being posterior in point of time, must yield to that of the debtor creditor, which is older. [Merrill v. Louther, 6 Dana, 305.]

What then was Rhodes' equity against the Rail Road Company, when the assignment was made, by reason of its insolvency? The difficulty in finding the appropriate answer to this question, grows out of the apparent injustice, on the one hand, of permitting the debtor corporation to receive the benefit of their debt when it is morally certain they never will discharge that for which Rhodes was the sponsor, and which he has since paid ; while,

on the other hand, there seems to be no English precedents, independent of those referred to on the construction of the bankrupt acts, of retaining a debt presently due, to answer one that will only become so at a future time. The cases decided upon the construction of the bankrupt statutes, are nothing more than the recognition of a principle well known to the civil law, which permitted a creditor having goods or effects, in possession of one afterwards becoming insolvent, to retain them until the debt was paid. The doctrine is treated of by Pardassus, under, and in connection with, bills of exchange, paragraph 183, vol. 1 ; 389 vol. 2; and afterwards, in treating of *des failletes.* See also, Ersk. Inst. b. 3, c. 35 ; Pothier *Traite des able,* n. 441; Wood's Inst. 227; Brown's Lectures, 362. We do not intend, however, to draw upon the civil law for reasons to sustain a proposition which, if it exist at all, is capable of elucidation from cases decided either at law or in equity, by those Courts from which we are authorized to look for binding precedents.

We have already referred to *Ex parte* Deeze, 1 Atk. 228, where a packer, having goods of a bankrupt to be packed, was permitted to retain, not only for the price of the packing, but also for a general debt. In French v. Denn, Cook's Bank. 536, cited at large in 8 Taunt. 499, the bankrupt had intrusted his creditor with his interest in a string of pearls, to be sold, *and the money to be paid to the bankrupt.* The creditor sold the pearls, after the act of bankruptcy, and the assignees brought trover : but it was held, that the creditor was protected, and might hold the money. The decision in Prescott's case, before cited, though placed to the credit of the bankrupt acts, would be equally sustainable upon natural equity, in a case of insolvency ; and such was evidently the opinion of Lord Eldon, when, in a controversy between the assignees of two bankrupts, one owed the other a cash balance, but was liable at the same time on bills for his creditor's accommodation, asks the question, if this creditor, while the paper with his debtor's name upon it was afloat, could have recovered the cash balance? He answers, that he could not ; the debtor would say, that the creditor had his name engaged, and it must be disentangled before the creditor could call for the cash balance. [*Ex parte* Metcalf, 11 Vesey, 404.] The same principle governs the cases of Willis v. Freeman, 12 East, 656, and Wilkins v. Casey, 7 Term, 711, though in neither is it so distinctly set

29

226 ALABAMA.

Tuscumbia, Courtland and Decatur Rail Road Co. et al. v. Rhodes.

forth as by Mr. Chitty, who cites them as sustaining the position, that a person who is an accommodation acceptor, may retain a debt or fund in his hands, *as indemnity to secure himself*, if his principal becomes either bankrupt or insolvent. [Chitty on Bills, 348.]

Lord Ellenborough, in Madden v. Kempster, 1 Camp. 12, expressly concedes this to be true, in relation to a bill, and it would be difficult to state a doctrine more obviously equitable, than that a debtor becoming his creditor's surety, when solvent, should be entitled to retain a debt in his hands, to secure himself, when his principal afterwards fails.

A contract is always implied for indemnity, between the principal and his surety, [Chitty on Bills, 347,] and it is on this ground, that the surety is permitted to file a bill against his principal, to compel him to pay, It has even been decided, that a Court of Equity will decree the specific performance of a contract for indemnity. [Ranelagh v. Hayes, 1 Vern. 180; 2 Story's Eq. 8 50.]

We think the cases cited, and principles adverted to, evince very satisfactorily, that one who stands to another in the relation of a surety, may, if his principal becomes insolvent, not only retain money in his hands, as indemnity to secure himself against loss, but also that personal chattels in the hands of the surety, upon bailment may be retained for the same purpose. The cases of *Ex parte* Deeze, and French v. Denn, indeed go greatly beyond this, and recognize the same right of retainer as to goods, as applying to a general creditor: and in Rose v. Hart, 8 Taunt, 185, it is said, that French v. Denn has been followed by a string of cases, for more than thirty years, all professing to be founded on it, and some of them containing the fullest approbation of *Ex parte* Deeze.

In our country, the cases are less numerous, but equally conclusive. In Feazle v. Dillard, 5 Leigh, 30, although the decision of the Court did not turn on the question, it was fully considered, and the Court of Appeals held, that a surety for a debt not due, when the assignment was made, was entitled to retain against the assignee, upon the insolvency of his principal, who was also his creditor by different transaction. It is there said, the insolvency constitutes a new ingredient in the case, and upon the principle of the bill *quia timet*, a Court of Equity will permit the retainer for the indemnity of the surety, unless the insolvent will

make some satisfactory indemnity. To the same effect is Abbey v. Van Campen, Freeman, 273 ; Williams v. Helm, 1 Dev. Eq. 151 ; Battle v. Hart, 2 ib. 31.

To conclude then, it seems clear, that the entire equity of Rhodes rests upon the insolvency of the Company, and that the existence of this fact, introduced new relations between them, whereby the former was entitled to retain the debt due to the latter, independent of the manner in which it was created, until the Company either relieved him from, or indemnified him against, his obligation ; as this equity existed when the assignment was made, that of Sherrod is controlled by it, and the debt having subsequently been paid by Rhodes, he is entitled to the relief which he seeks.

The result of our protracted examination of this case is, the affirmance of the Chancellor's decree, contrary to our first impressions.

ORMOND, J.—In dissenting from the opinion of the majority of the Court, I do not propose to enter upon an elaborate examination of the question. I have done so in the opinion previously delivered, and after an anxious reconsideration of it, I feel myself constrained to adhere to it.

I am thoroughly satisfied, that the principle which is made to govern this case, cannot be derived from the equity of our statute of set off, and has no foundation whatever in the "natural equity" to which the doctrine of stoppage, or compensation, owes its existence. On the contrary, I think it is demonstrable, that the rule which is made to govern this case, has its origin in the bankrupt law of England, by a liberal and equitable interpretation of the term "mutual credit," to be found in that act, though wanting in the statutes of set off, which speak only of "mutual debts." By an equitable interpretation of the bankrupt law, when debts exist between two persons, they are each supposed to give the other a credit, on the faith of the debt each owes the other, and this has been carried so far, as to be held applicable, when one of the parties was ignorant, that the other held a security upon him. [Hankey v. Smith, 3 Term, 507, in note.]

Lord Hardwicke, who can't very well be presumed to be ignorant upon this subject, says, that before the passage of the act of the 5 Geo. 2, no such right existed. He commences his judg-

ment, by saying, " No case has been cited to me, either on one side, or the other, and therefore I must make a precedent," and after stating the case, to be, that of a debt not due, which was offered against the assignee of a bankrupt, as a set off, and after reciting the act of 5 Geo. 2, proceeds to say: " Before the making of this act, if a person was a creditor, he was obliged to prove his debt under the commission, and to receive perhaps only a dividend of 2s. 6d. in the pound, from the bankrupt's estate, and at the same time pay the whole to the assignee, of what he owed to the bankrupt; to remedy this very great inconvenience, and hardship, the act was made." He concludes, that it is a case of "mutual credit," within the equity of the statute.

Since that time, the construction of the statute has been generally in accordance with the rule thus established. But it appears to me, it can admit of no controversy, that without the aid of the statute, no such decision could have been made. Such a consummate master of equity, as Lord Hardwick, certainly knew what had previously been the rule of decision, and if he was ignorant, the able counsel practising before him were equally so, as they could cite no case in point. Some few, straggling, badly reported cases, there were to be sure, not referrable to any established head of equity. These remarks do not apply to Lanesborough v. Jones, 1 P. Will. 326, which is put by Lord Chancellor Cowper, expressly upon the term " mutual credit," in the 4th Anne, c. 17, and in that case the debts appear to have been due on both sides.

So in Jeff v. Wood, 2 P. Will. 1291, the stoppage was allowed, because there were " mutual debts," and the balance was decreed; the Master of the Rolls agreeing, that in the absence of any agreement to that effect, there could be no stoppage, unless the debts were due, when the balance only would be the true debt. The later English authorities confirm this doctrine, and I will merely refer to the cases cited by Judge Story, 2d Com. on Eq. 658, 664.

The case Ex parte Deeze, 1 Atk. 228, was evidently determined upon the usage of trade, by which the " packer" of the goods, retained a lien upon them, for the payment of the price of the packing. Such being the case, Lord Hardwicke asks, " what right has a Court of Equity to say, that if he has another debt due to him from the same person, that the goods shall be ta-

ken from him, without having the whole paid ?" He concludes by admitting, that if there had been no bankruptcy, in an action for these goods, the debt could not have been set off, yet that it might come within the extended meaning of the term *mutual credit.*

The case *Ex parte* Hale, cited from 3 Vesey, 304, was only cited by me to show, that even under the bankrupt law of England, a set off in bankruptcy, must be an absolute, and not a contingent liability. The argument then made, did not rest on that case for support. We have no bankrupt law here, under which such an off set can be made, whether contingent or absolute. That case was adduced, as fortifying the point, not as essential to the proposition maintained.

Insolvency, is doubtless a sufficient reason in many cases for the interposition of a Court of Chancery, and as such, has been frequently recognized in this Court—as, where an insolvent man, is seeking to coerce a debt from one, to whom he is indebted, but which, from some cause, cannot be set off at law. As between the debtor, and creditor, there can be no doubt of the power, and the duty of Chancery, in such a case to interpose. But where third persons have acquired rights, different considerations arise, and according to my notions of equity, it would be unjust in a Court of Chancery to interpose, and deprive an assignee of his legal rights, unless there is a natural equity growing out of the transaction itself, of which it is just that the debtor should be permitted to avail himself.

I can see none such in this case. The debts are not mutual in any sense of the term, nor can there be any pretence of an agreement for stoppage ; nor is there any equity inherent in, or growing out af the debt, due from Rhodes to the Rail Road, which a Court of Equity can give effect to. It is the naked case of a set off, allowed against the assignee, which had no existence until long after the debt matured, which the debtor owed the Company, and which had been before assigned.

I do not deny that the Virginia, and Kentucky cases, do support the opinion pronounced. With all respect for those enlightened tribunals, I would insist, that they are not based upon the rules of equity, as administered in England, independent of the statute of bankruptcy; but are founded, as is shown by the cases

themselves, upon decisions growing out of the bankrupt acts· That these acts introduced a principle, unknown before to the English Chancery, can, I think, neither admit of doubt or controversy.